# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of:<br><br>ANDY WRIGHT,<br><br>                             Petitioner. | No. 57923-5-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, P.J. — Andy Wright filed a personal restraint petition (PRP) seeking relief from personal restraint following his convictions for one count of first degree rape of a child, one count of second degree rape of a child, two counts of first degree child molestation, one count of second degree child molestation, and one count of third degree child molestation. Wright argues he received ineffective assistance of counsel when his counsel failed to (1) cross-examine and impeach "primary witnesses," (2) call certain witnesses, and (3) present exculpatory evidence. We disagree and deny Wright's PRP.

## FACTS[1]

Wright engaged in various sexual acts with three children: C.T., H.T., and D.T. (collectively, the boys). H.T. was born in August 2003. C.T. was born in December 2001. D.T. was born in April 1997.[2]

---

[1] Pursuant to RAP 7.3, the clerk's papers and report of proceedings from Wright's direct appeal (case no. 54420-2-II) are transferred to Wright's PRP (case no. 57923-5-II).

[2] D.T. provided different birthdates in his pretrial defense interview and trial testimony. This opinion uses the date D.T. provided at trial.

On October 28, 2019, the State charged Wright with one count of first degree rape of a child, one count of second degree rape of a child, two counts of first degree child molestation, one count of second degree child molestation, and one count of third degree child molestation. The State alleged the following aggravating circumstances for each count: use of a position of trust and ongoing pattern of sexual abuse.

A.     PRE-TRIAL INVESTIGATION

Each of the boys completed two pre-trial interviews, the first with either a forensic interviewer or the police, and the second with defense counsel and counsel's investigator. During their pre-trial interviews, the boys provided statements regarding the details of Wright's sexual misconduct and the timeline of events.

Defense counsel's investigator also interviewed K.W., Wright's wife, prior to trial.

1.     H.T.'s Pre-trial Interviews

In his forensic interview, H.T. wrote that Wright "put his penis in my butt." PRP, App. C, Ex. E at 325, 328. In his defense interview, H.T. also described Wright putting his penis in H.T.'s butt. During that same defense interview, H.T. initially mentioned two instances of abuse, but when asked about the second, said he could not "remember the second [instance], if there was one," and that his earlier recollection of two instances of abuse was "not accurate." PRP, App. C, Ex. F at 342. H.T. also said he thought he saw Wright attempt to stick his penis in C.T.'s butt.

2.     C.T.'s Pre-trial Interviews

In his forensic interview, C.T. described an incident where Wright got in the shower with C.T., took C.T.'s hand, and put it on Wright's penis. C.T. said it was just him in the shower at the

time. In the same interview, C.T. described other instances where Wright would get in the shower with him and H.T. and touch their penises.

In his defense interview, C.T. described an incident where Wright exposed his penis to C.T. and then took C.T.'s hand and put it on Wright's penis.

In both interviews, C.T. also described an incident of abuse that occurred in Wright's travel trailer. In his forensic interview, C.T. said the incident occurred "before [the Wrights] were moving back to [California] for the last time" and "I think it was seventh grade," "around October/November time." PRP, App. C, Ex. C at 175, 177, 196. That meant the incident occurred in October or November 2014,[3] before the Wrights purchased the travel trailer, according to the purchase receipt attached to Wright's PRP. In his defense interview, C.T. said the trailer incident occurred before the Wrights moved to California for the second time, when he was in sixth grade and 12 or 13 years old, meaning it occurred in 2013 or 2014, before the Wrights purchased the travel trailer. During the same defense interview, C.T. also said the trailer incident was "the last time" Wright acted inappropriately with him. PRP, App. C, Ex. D at 270.

### 3. D.T.'s Pre-trial Interviews

In his police interview, D.T. described how Wright would stroke D.T.'s penis.

In his defense interview, D.T. described an incident where Wright "poked [D.T.] in the private area," then stroked D.T.'s penis "about, like, three or four times and stopped." PRP, App. C, Ex. B at 94, 98. Afterwards, Wright masturbated himself until ejaculation. In the same

---

[3] At trial, C.T.'s mother and father testified that C.T. was a senior in high school. C.T.'s father testified C.T. had never been held back in school. Thus, C.T. was in seventh grade for the 2014-15 school year.

interview, D.T. described at least three more instances of abuse in which Wright would poke or shake D.T.'s penis, stroke it briefly, and then masturbate himself. During the same interview, D.T. was asked to estimate how many times Wright touched him in total, and D.T. estimated "five to seven times." PRP, App. C, Ex. B at 129. When asked whether he was certain Wright molested him less than 10 times, D.T. said it "[c]ould be more than ten. . . . It happened quite a bit to where I don't remember how much total times it happened. But my guess is seven plus." PRP, App. C, Ex. B at 142.

    4.    K.W.'s Pre-trial Interview

In her interview, K.W. said that when the boys spent the night, she would sometimes "sleep in the living room" with them and that "she and [Wright] would rotate turns being with the boys." PRP, App. D, Ex. B at 390. The defense investigator asked K.W. whether "there were times that [Wright] would be in the living room sleeping and she would be upstairs sleeping" and K.W. said "yes." PRP, App. D, Ex. B at 390. K.W. also said that she was not in the living room "all of the time." PRP, App. D, Ex. B at 391. Finally, she told the defense investigator that "it was . . . impossible for [Wright] to molest anyone without her or [their son, A.W.] seeing it happen." PRP, App. D, Ex. B at 391.

In a declaration attached to Wright's PRP, K.W. stated she "never saw [Wright] molest or inappropriately touch any of the . . . boys. Given how often I stayed downstairs within eyesight of the living room, there is no way this could have happened without me noticing." PRP, App. F at 412.

4

B.    TRIAL

Trial commenced on November 13, 2019.  During opening statement, defense counsel explained that the initial disclosure of abuse came from C.T., after he got in trouble with his parents "for . . . a serious issue."  4 Verbatim Rep. of Proc. (VRP) (Nov. 13, 2019) at 897.  Defense counsel explained that, over the course of the trial, he expected the jury would hear "significant differences" between the boys' accounts of what happened to them in their pre-trial interviews.  4 VRP (Nov. 13, 2019) at 900.  As an example, defense counsel told jurors that he expected D.T.'s testimony to show that he initially told police he and Wright had masturbated together, but then denied as much in his defense interview.

1.    State's Case in Chief

The State called several people to testify regarding the investigation into the boys' claims: Detective Mike Grant, sexual assault nurse examiner program manager Katherine Espy, former Kitsap County Sheriff Heather Kennedy[4], and forensic interviewer Karen Sinclair.  Testimony relevant to this PRP includes:

a.    Detective Grant's testimony

On cross-examination, defense counsel asked Detective Grant whether he recalled D.T. telling him "that he had masturbated with . . . Wright."  4 VRP (Nov. 13, 2019) at 937.  The State objected to hearsay and the trial court sustained the objection.  In a discussion held outside the presence of the jury, the State asserted that defense counsel was trying to "pre-impeach [D.T.]," and the trial court responded, "We're not there yet.  [D.T.] may be impeached" through Detective

---

[4] Detective Kennedy is also referred to as Detective Wright.

Grant, but only if D.T. first "testifies to something different." 4 VRP (Nov. 13, 2019) at 941-42. Towards the end of his initial cross-examination of Detective Grant, defense counsel reminded the witness he was "still under a subpoena for the defense case to be called." 5 VRP (Nov. 14, 2019) at 1030.

   b.  H.T.'s testimony

On direct examination, H.T. testified that Wright "tried to have intercourse" with H.T. by putting his penis in H.T.'s anus. 5 VRP (Nov. 14, 2019) at 1139. When asked whether there were "any other similar incidents with . . . Wright," or whether Wright ever tried to touch H.T. or his penis, H.T. answered "[n]o." 5 VRP (Nov. 14, 2019) at 1141.

Defense counsel did not cross-examine H.T.

   c.  C.T.'s testimony

C.T. first described an incident where Wright showed C.T. his penis. C.T. said he "was probably about eight" at the time. 5 VRP (Nov. 14, 2019) at 1159. C.T. testified that Wright asked if C.T. wanted to touch Wright's penis, but that C.T. declined. C.T. also described Wright's penis as "bent to the right a little bit." 5 VRP (Nov. 14, 2019) at 1160.

C.T. then described an incident where Wright molested him in the shower. H.T. was also in the shower. C.T. testified that Wright touched C.T.'s penis. C.T. also testified that he saw Wright do "the same thing" to H.T. 5 VRP (Nov. 14, 2019) at 1167.

C.T. also described an incident where Wright abused him while he, H.T., and A.W. spent the night in the Wrights' travel trailer. He said the incident happened "right before [the Wrights] moved to [California] for the second time," when he "was probably about 12 or 13." 5 VRP (Nov.

14, 2019) at 1168, 1169. Because C.T. was born in December 2001, he was 12 or 13 from December 2013 to December 2015.

Defense counsel cross-examined C.T. as to whether C.T. told anyone besides his parents about the abuse, whether he texted Wright "at some point," and whether he had previously told his forensic interviewer that Wright had a tattoo. 5 VRP (Nov. 14, 2019) at 1207. C.T. testified that Wright had what he thought was "a dragon tattoo on his upper, right shoulder blade or left shoulder blade; one of the two." 5 VRP (Nov. 14, 2019) at 1207.

        d.      D.T.'s testimony

At trial, D.T. recounted at least four instances where Wright touched D.T.'s penis and then Wright masturbated himself.[5] D.T. testified that Wright touched him "[t]oo many [times] to count," estimating "[f]ifteen plus" instances when asked for a "ballpark" figure. 5 VRP (Nov. 18, 2019) at 1379-80.

Defense counsel also cross-examined D.T. During cross-examination, defense counsel asked D.T. whether he remembered telling police he and Wright masturbated together. D.T. could not recall having told police as much, even after reviewing an excerpt from the transcript of his

---

[5] D.T. testified that his family moved into the neighborhood sometime in 2008, that the Wrights moved in "a couple of months" later, and that he began spending the night at their home "a month or so" after meeting the Wrights. 5 VRP (Nov. 18, 2019) at 1329, 1333. He also testified that the first time Wright touched him inappropriately was "two months or so into staying the night" at the Wrights' home. 5 VRP (Nov. 18, 2019) at 1344. D.T. then described three more instances of abuse, each separated in time by two to four weeks. Because the charging period for one of the counts relating to D.T. (count VI) was April 26, 2011 to April 25, 2013, D.T.'s initial timeline would necessarily fall outside the charging period. However, D.T. also testified that the abuse occurred when he was 12-14 years old, meaning it occurred between April 2009 and April 2012. D.T. also specified that at least one instance of abuse occurred when he was 13 or 14 years old, meaning it occurred between April 2010 and April 2012. Thus, at least one instance of abuse fell within the charging period for count VI.

police interview. Clerk's Papers at 202 (identifying Exhibit 5 as "1 page of transcript from [D.T.] interview"). Finally, defense counsel asked D.T. whether A.W. was always present when D.T. stayed over at the Wrights', and D.T. confirmed that was the case.

2.      Wright's Case in Chief

Defense counsel recalled C.T. during Wright's case in chief. C.T. testified that A.W. was always present when C.T. spent the night at the Wrights' home.

A.W. also testified. A.W. testified that Wright never had tattoos on his back and that he never saw Wright touch any of the boys. On cross-examination by the State, A.W. testified that "every time the [boys] slept over," they fell asleep before A.W. 6 VRP (Nov. 19, 2019) at 1527. A.W. also testified that he remembered spending time with the boys in his family's travel trailer when it was at the Wrights' home.

The boys' father also testified. He testified that C.T. had issues with marijuana and that he had multiple conversations with C.T. about it. He had a conversation with C.T. about "why [C.T.] ke[pt] choosing to use cannabis." 6 VRP (Nov. 19, 2019) at 1533. The boys' father recounted that during the conversation, he asked C.T. whether he was using cannabis because he had experienced trauma: "I said, you know, 'A traumatic experience such as, you know, a sexual abuse or somebody touching you; you know, something like that.'" 6 VRP (Nov. 19, 2019) at 1540. C.T.'s mother was also present for the conversation. It was during this conversation that C.T. first accused Wright of abusing him.

Defense counsel also called James Harris, a private investigator, to the stand. Harris testified that he took photos of Wright's back, and those photos were admitted into evidence[6] and published to the jury. Harris testified he saw no "indication . . . that there had been a tattoo removed," and that he saw "no tattoos of dragons anywhere." 6 VRP (Nov. 19. 2019) at 1579, 1582.

Defense counsel did not call K.W., Wright's wife, to testify as a witness for the defense.

During closing argument, defense counsel noted that C.T. was "very, very detailed in everything that he recounted to you up there on the witness stand." 7 VRP (Nov. 20, 2019) at 1699. Defense counsel further argued that in light of C.T.'s detailed testimony and recollection that Wright had a dragon tattoo, proof that Wright had no dragon tattoo "creates reasonable doubt as to [C.T.'s] entire testimony." 7 VRP (Nov. 20, 2019) at 1700. Defense counsel also argued that C.T. and his brothers made up the allegations of abuse in an attempt to deflect from C.T. getting in trouble for using marijuana.

The jury found Wright guilty on all counts. The jury also found the presence of all of the aggravating circumstances.

C.     DIRECT APPEAL

Wright appealed his convictions. *State v. Wright*, No. 54420-2-II (Wash. Ct. App. Oct. 26, 2021) (unpublished), *review denied*, 199 Wn.2d 1003 (2022).[7] On appeal, Wright "argu[ed] that the trial court violated his right to present a defense by restricting Wright's ability to question the

---

[6] There are no photos in the record before this court.

[7] https://www.courts.wa.gov/opinions/pdf/D2%2054420-2-II%20Unpublished%20Opinion.pdf.

[boys'] parents about their first reaction to CT's initial disclosure." *Id*. at 1. "In a statement of additional grounds for review, Wright also argue[d] that the trial court violated his due process and confrontation rights and that the State improperly withheld exculpatory evidence." *Id*. at 1-2. This court "disagree[d] with all of Wright's claims and affirm[ed] his convictions." *Id*. at 2, 11. The mandate issued on March 3, 2022.

D.      PERSONAL RESTRAINT PETITION

On February 27, 2023, Wright timely filed this PRP.[8]  Among other things, Wright included a declaration from defense counsel, David LaCross.  In his declaration, defense counsel acknowledged identifying alleged inconsistencies between the boys' pre-trial interviews prior to trial, and attached his and his investigators' notes regarding the inconsistencies.  Defense counsel also acknowledged that he did not cross-examine H.T. or C.T. about their alleged inconsistent statements and that he did not cross-examine D.T. "about most of his prior inconsistent statements." PRP, App. D at 365.  Defense counsel "believed that the lack of tattoo evidence and [A.W.'s] testimony, along with my cross-examination of the officers about their incomplete investigation, could create a reasonable doubt as to Wright's guilt." PRP, App. D at 365.

Defense counsel further acknowledged that his investigator interviewed K.W. prior to trial and attached the investigator's notes from that interview.  Counsel also acknowledged that he "did not call [K.W.] as a witness." PRP, App. D at 366.

---

[8]  RCW 10.73.090(1) requires that a PRP be filed within one year of the date that the petitioner's judgment and sentence becomes final.  Wright's judgment and sentence became final on March 3, 2022, when this court issued the mandate following direct appeal.  RCW 10.73.090(3)(b).  Wright timely filed his PRP less than a year later, on February 27, 2023.

Finally, Wright provided his own declaration. Wright also provided medical records from his doctor stating that Wright's "[p]enis appears straight without evidence of curvature" or "fibrosis or masses." PRP, App. E, Ex. B at 403. He also included a March 2015 travel trailer purchase receipt, his wife's medical records regarding her insomnia, and an email regarding his travel schedule. Wright explained that he provided all of this potential evidence to defense counsel before trial commenced.

## ANALYSIS

### A. STANDARD OF REVIEW

To be entitled to relief in a PRP, the petitioner must establish either a constitutional error that resulted in actual and substantial prejudice or a nonconstitutional error that amounts to "a fundamental defect resulting in a complete miscarriage of justice." *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17-18, 296 P.3d 872 (2013). "We apply the same prejudice standard to ineffective assistance claims brought in a personal restraint petition as we do on appeal." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). Therefore, "if a personal restraint petitioner makes a successful ineffective assistance of counsel claim," then they necessarily meet their burden to show actual and substantial prejudice. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

### B. INEFFECTIVE ASSISTANCE OF COUNSEL

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance of counsel claim, petitioner must show that defense counsel's performance fell below an objective standard

of reasonableness and that, because of the deficient performance, the result of his case probably would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995); *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

When counsel's performance "falls 'below an objective standard of reasonableness,'" it is deficient. *Estes*, 188 Wn.2d at 458 (quoting *McFarland*, 127 Wn.2d at 334). But counsel's performance is not deficient when the conduct can be characterized as legitimate strategy or tactics. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

We strongly presume that defense counsel's performance was reasonable. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). "[A] [petitioner] can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Id.* at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

To show prejudice, the petitioner must show that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Id.* at 34 (quoting *Kyllo*, 166 Wn.2d at 862). "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice." *Crace*, 174 Wn.2d at 846-47.

1.      Cross-Examination of the Boys

Wright argues defense counsel "was ineffective for failing to effectively cross-examine the" boys and "utterly fail[ing] to put in front of the jury substantial evidence of the . . . boys' prior inconsistent statements." PRP at 42-43. We disagree.

Cross-examination, like other matters of trial strategy, is entrusted to the professional discretion of counsel. *In re Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004); *see also In re Stenson*, 142 Wn.2d 710, 736, 16 P.3d 1 (2001) ("'The decisions on . . . how to conduct cross-examination . . . and *all other strategic and tactical decisions* are the exclusive province of the lawyer after consultation with the client.'" (emphasis in original) (quoting 1 ABA, STANDARDS FOR CRIMINAL JUSTICE std. 4-5.2 (part) (2d ed. Supp. 1986)). Where counsel's lack of cross-examination "falls within the range of reasonable representation," this court "need not determine why trial counsel did not cross-examine." *Davis*, 152 Wn.2d at 720. And while hindsight might allow this court to "'speculate as to whether another attorney could have more efficiently attacked the credibility of . . . witnesses,'" "[t]he extent of cross-examination is something a lawyer must decide quickly and in the heat of the conflict'" and "'is a matter of judgment and strategy.'" *Id.* (first alteration in original) (quoting *State v. Stockman*, 70 Wn.2d 941, 945, 425 P.2d 898 (1967)). "A decision not to cross examine a witness is often tactical because counsel may be concerned about opening the door to damaging rebuttal or because cross examination may not provide evidence useful to the defense." *In re Brown*, 143 Wn.2d 431, 451, 21 P.3d 687 (2001). "[E]ven a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 489, 965 P.2d 593 (1998). To establish prejudice from an ineffective cross-examination, petitioner must "demonstrate how . . . testimony on cross-examination could have overcome the . . . evidence against him." *Davis*, 152 Wn.2d at 720.

Here, the alleged inconsistencies Wright identifies can be categorized into four groups: those that are not actually inconsistent, inconsistencies regarding the boys' timeline of events,

inconsistencies regarding whether the boys witnessed each other's abuse, and inconsistencies regarding the details of two alleged instances of abuse.

The first group does not support Wright's ineffective assistance claim because, when read in the context of the entire record and pre-trial interviews, those statements were not actually inconsistent with the boys' testimony. For example, Wright argues that defense counsel should have cross-examined H.T. about the fact that during his pre-trial interview, he "initially [said] Wright molested him 'two' times but then later admitted that" "was . . . not accurate," and that he could not "remember the second [time], if there was one." PRP at 44; PRP, App. C, Ex. F at 342. This was consistent with H.T.'s trial testimony, where he recounted only one incident of abuse.

Wright also argues defense counsel was ineffective for failing to cross-examine D.T. on the various estimates he gave regarding how often Wright abused him. However, all of the numbers D.T. gave were estimates. When asked pre-trial whether he was certain Wright molested him less than 10 times, D.T. said it "[c]ould be more than ten. . . . It happened quite a bit to where I don't remember how much total times it happened. But my guess is seven plus." PRP, App. C, Ex. B at 142. And at trial, D.T. said Wright touched him "[t]oo many [times] to count," and only responded "[f]ifteen plus" when asked for a "ballpark" figure. 5 VRP (Nov. 18, 2019) at 1379-80.

As to the second group, defense counsel's decision to not focus on inconsistencies in the boys' timeline of events is reasonable in light of the number of charges and victims, and the fact that the trial took place in October and November of 2019, four to twelve years after Wright abused the boys, when the boys were between the ages of 5 and 13 (C.T.), 10 and 15 (D.T.), and 3 and 11

(H.T.). And charging periods for the offenses spanned a number of years.[9] Finally, while the boys varied in recalling how old they were or what grade they were in when Wright abused them, the details of the abuse itself were largely consistent.[10]

As to the third group of statements relating to whether the boys witnessed each other's abuse, Wright appears to argue that defense should have brought up on cross-examination instances where the boys could corroborate each other's claims of sexual misconduct by Wright. Wright fails to explain how avoiding having the jury hear corroborating testimony through cross-examination that supported the boys' sexual misconduct claims against Wright was deficient. Rather, it was a legitimate trial strategy for defense counsel to avoid giving the boys the opportunity to corroborate each other's allegations of sexual misconduct by Wright.

In a related argument, Wright alleges defense counsel was ineffective for failing to cross-examine H.T. about his pre-trial statements that he witnessed Wright attempt anal sex with C.T.

---

[9] The State charged the following periods for each offense: Count I (second degree rape of a child—C.T.) August 1, 2007 and December 11, 2015; Count II (first degree child molestation—C.T.) August 1, 2007 and December 11, 2013; Count III (first degree rape of a child—H.T.) August 1, 2007 and August 17, 2015; Count IV (first degree child molestation—H.T.) August 1, 2007 and August 17, 2015; Count V (second degree child molestation—D.T.) August l, 2007 and April 25, 2011; and Count VI (third degree child molestation—D.T.) April 26, 2011 and April 25, 2013.

[10] For example, Wright argues that defense counsel should have cross-examined C.T. about the timing of the shower incident, because C.T.'s age estimates for that incident—10 or 11 years old—meant the incident occurred after the Wrights moved to California for the first time and before they returned to Washington. However, C.T. testified that he "was *probably* about 10 or 11" when the shower incident occurred. 5 VRP (Nov. 14, 2019) at 1162 (emphasis added). In the face of C.T.'s inexactness about how old he was, and the amount of time that passed between the abuse and trial, it was reasonable for defense counsel to forego cross-examination on this point; pressing the timing may have allowed C.T. to clarify his timeline of events, which would not otherwise have helped the defense's case. Wright makes similar arguments—that the boys' pretrial temporal estimates place the abuse during the Wrights' first move to California—with regards to H.T. and D.T.

But neither H.T. nor C.T. testified to any such attempt at trial, and pointing out the inconsistency would have come at the expense of highlighting additional sexual misconduct by Wright, making defense counsel's decision not to cross-examine H.T. on the point a legitimate trial strategy and not deficient.

As to the fourth group of statements, Wright argues that defense counsel provided ineffective assistance by failing to cross-examine C.T. about inconsistencies in the details of Wright's sexual misconduct. Specifically, Wright claims that defense counsel should have exposed on cross-examination the fact that C.T. was not in the shower by himself, but with H.T. (contrary to his forensic interview) and that Wright had broken his toe in the shower (also contrary to his forensic interview). Because C.T. described more than one shower incident in his forensic interview, it is unclear whether C.T.'s trial testimony that Wright molested him and H.T. while they were in the shower together contradicts his pre-trial statements. Furthermore, even if pointing out these inconsistencies had some marginal value to the defense, it would have come at the expense of highlighting additional sexual misconduct by Wright, making defense counsel's decision to not engage in a cross-examination of C.T. a legitimate trial strategy and not deficient.

Wright further argues that defense counsel should have cross-examined C.T. on the fact that he testified at trial "that Wright exposed himself to CT," whereas C.T. stated in his defense interview that Wright "also grabbed CT's hand and put it on Wright's penis." PRP at 47. But defense counsel could reasonably have decided to not cross-examine C.T. on this point and draw out the additional details that emphasize conduct more egregious than what was testified to.

16

Wright also argues that "counsel's failure to conduct an effective cross-examination" was "[c]ompound[ed]" by defense counsel "promising jurors in his opening statement [that] they would hear about 'significant inconsistencies' among the . . . boys' testimony." PRP at 51. We disagree.

Where a petitioner alleges ineffective assistance based on counsel's failure to follow through on a promise made in opening statements, our supreme court has explained, "'[A]ssuming counsel does not know at the time of the opening statement that he will not produce the promised evidence, an informed change of strategy in the midst of trial is virtually unchallengeable.'" *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 898, 952 P.2d 116 (1998) (internal quotation marks omitted) (quoting *Turner v. Williams*, 35 F.3d 872, 904 (4th Cir. 1994), *cert. denied*, 514 U.S. 1017 (1995)).

Here, defense counsel did follow through on his promise made in opening statements by cross-examining D.T. on whether he and Wright masturbated together. But defense counsel did attack C.T.'s credibility by highlighting the lack of tattoo evidence through Harris and A.W., who both testified that Wright did not have a dragon tattoo. Defense counsel also attacked C.T.'s credibility by presenting testimony supporting the defense theory of fabrication and arguing in closing that C.T. and his brothers made up the allegations to avoid C.T. getting in trouble for using marijuana. Thus, while defense counsel may initially have intended to highlight more inconsistencies in the boys' testimony, it was reasonable for defense counsel to forego that strategy in favor of emphasizing the defense theory of the case and in light of how each boy testified at trial.

Ultimately, Wright fails to prove an absence of legitimate trial strategy or tactics behind defense counsel's decision to not conduct a detailed cross-examination of the boys to highlight

inconsistencies between their trial testimony and statements made in pre-trial interviews. Defense counsel "believed that the lack of tattoo evidence and [A.W.'s] testimony, along with [his] cross-examination of the officers about their incomplete investigation, could create a reasonable doubt as to Wright's guilt." PRP, App. D at 365. While defense counsel's strategy did not prevail, we cannot find defense counsel performed deficiently merely because, in hindsight, Wright claims another strategy may have worked better. Accordingly, defense counsel was not deficient.

2.      Failure to Call Detective Grant and K.W.

Wright argues that defense counsel "should have recalled Detective Grant as a defense witness and called [K.W.] as a witness" because defense counsel could have impeached the boys' version of events through Detective Grant's testimony, while K.W.'s testimony would show she was often present when the boys spent the night and never witnessed any abuse. PRP at 57. We disagree.

A decision not to call a witness "'is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics'" and will not support a claim for ineffective assistance of counsel. *State v. Bogdanov*, 27 Wn. App. 2d 603, 532 P.3d 1035, 1053 (quoting *Lui*, 188 Wn.2d at 545), *review denied*, 539 P.3d 4 (2023). The attorney is in a better position than the reviewing court to determine whether calling a witness "will help or hurt the defendant's case." *State v. Robinson*, 79 Wn. App. 386, 396, 902 P.2d 652 (1995).

Here, Wright argues that "[o]nce the State rested, the only viable option [to impeach D.T.] was to recall Detective Grant." PRP at 58. Wright is correct that defense counsel could have recalled Detective Grant to impeach D.T. However, the same considerations noted above that likely prompted defense counsel to leave many of the alleged inconsistencies out of his cross-

18

examination of D.T. would also apply to counsel's decision not to recall Detective Grant to explore those same inconsistencies. Thus, Wright fails to show that counsel's decision to not recall Detective Grant to impeach D.T. was not a legitimate trial strategy or tactical decision.

Wright argues that defense counsel's failure to recall Detective Grant was particularly deficient because defense counsel "more or less promised the jury that [he] would recall Detective Grant and ask him questions about all the boys' prior statements and then refused to do so." PRP at 59. Again, the same reasons noted above that likely prompted defense counsel to leave many of the boys' alleged inconsistencies untouched would also apply to counsel's decision not to recall Detective Grant to explore the inconsistencies in the boys' testimony.

Also, the trial record shows that D.T. was unable to recall what he told Detective Grant with regards to whether he and Wright masturbated together. Therefore, defense counsel could reasonably have made the strategic decision to not recall Detective Grant to delve into inconsistencies between D.T.'s trial testimony and statements made to Detective Grant because it was not beneficial to the defense. In a similar vein, H.T. had difficulty remembering some details regarding Wright's actions towards him. *See* 5 VRP (Nov. 14, 2019) at 1105, 1108, 1123, 1140, 1141 (answering at least nine questions with "I don't remember" or "I actually don't remember"). Therefore, defense counsel could reasonably and strategically have decided not to impeach H.T. through Detective Grant because an attempt to do so would have emphasized Wright's conduct and would not have been beneficial to the defense.

Wright also argues that defense counsel was ineffective for failing to call Wright's wife, K.W., to testify. He argues that K.W.'s testimony was necessary to rebut the "substantial evidence" presented by the State that "most nights [K.W.] left to go to bed upstairs early." PRP

at 59. He also argues that K.W. would have testified "that she never saw Wright engage in any inappropriate conduct with any of the . . . boys," testimony that "would have likely created reasonable doubt in at least one or more jurors." PRP at 60, 61.

As to the first argument, defense counsel knew, based on his investigator's interview of K.W., that K.W. was not present every time the boys spent the night and that Wright sometimes spent the night alone downstairs with the boys while K.W. slept upstairs. *See* PRP, App. D at 366 ("In July 2018, my investigator interviewed [K.W.]."), *and* PRP, App. D, Ex. B at 390 (defense investigator notes that "there were times that [Wright] would be in the living room sleeping and [K.W.] would be upstairs sleeping"). Thus, defense counsel could reasonably have determined that K.W.'s testimony would do little to actually rebut testimony that she was not present for the abuse. Defense counsel could also reasonably have determined that K.W.'s assertion that she never witnessed any abuse was not as strong as A.W.'s similar assertion because A.W. was present every time the boys spent the night and K.W. was admittedly not. *See* PRP, App. D, Ex. B at 390 ("I asked [K.W.] if there were times that [Wright] would be in the living room sleeping and she would be upstairs sleeping, and she said yes."). Thus, defense counsel's failure to call K.W. does not constitute deficient performance.

3.    Allegedly Exculpatory Evidence

Wright argues that defense counsel was ineffective for "failing to present exculpatory evidence that would have resulted in at least a partial acquittal," namely a purchase receipt for the Wright family's travel trailer and medical evidence concerning the appearance of Wright's penis. PRP at 61. We disagree.

20

Wright argues that the date of purchase on the receipt would have cast doubt on C.T.'s timeline of events because C.T.'s pre-trial estimates about when the incident occurred placed it in 2013 or 2014, before the Wrights purchased the trailer. However, the record fails to support Wright's argument. The receipt shows the Wrights purchased the trailer in March 2015. At trial, C.T. testified that Wright raped him in the travel trailer "before [the Wrights] moved back down [to California] for the second time," when he was "probably about 12 or 13" years old. 5 VRP (Nov. 14, 2019) at 1168, 1169. C.T.'s age estimate means "the trailer incident would have occurred at some point between December 2013 and December 2015." PRP at 62. The charging period for the incident in the trailer was August 1, 2007 to December 11, 2015. Thus, far from exculpating Wright, the receipt would actually have bolstered the State's case.

Wright also argues that defense counsel provided ineffective assistance by failing to use the receipt to impeach because "the combination of an effective cross-examination along with the travel [trailer] receipt would have dramatically helped Wright mount an effective defense" by attacking C.T.'s timeline of events. PRP at 62. However, as noted above, defense counsel's decision to not attack the boys' timelines was reasonable given the number of charges and victims; the fact that the trial took place four to twelve years after Wright abused the boys, when the boys were between the ages of 5 and 13 (C.T.), 10 and 15 (D.T.), and 3 and 11 (H.T.); and the charging periods for the offenses spanned a number of years.

Furthermore, while C.T.'s temporal estimates for the travel trailer incident varied between his pre-trial interviews and testimony at trial, C.T. consistently placed the incident before the Wrights moved to California for the second time. Thus, it was reasonable for defense counsel to

forego cross-examining C.T. on exactly how old he was, or what grade he was in, when the trailer incident occurred.

And, to the extent Wright argues that defense counsel should have contrasted C.T.'s temporal estimates with the periods of time the Wrights were in California, defense counsel's decision not to was a strategic and reasonable one. Wright notes that he and his family moved to California for the second time in February 2016. If the incident occurred when C.T. was 13, as C.T. estimated at trial, it would have occurred between December 2014 and December 2015. Thus, C.T.'s pre-trial statements and trial testimony that the incident occurred before the Wrights moved to California for the last time aligns with when Wright claims they moved to California for the second and final time. Thus, defense counsel's decision to not introduce the travel trailer receipt was a legitimate strategy and not deficient.

Wright further argues that defense counsel should have introduced evidence from Wright's doctor that his "[p]enis appears straight without evidence of curvature," to contradict C.T.'s testimony that it appeared "bent to the right a little bit." PRP, App. E, Ex. B at 403; 5 VRP (Nov. 14, 2019) at 1160. Wright asserts that "[i]f [C.T.] could not accurately describe Wright's penis, then jurors could reasonably be skeptical that [C.T.] had even seen Wright's penis." PRP at 64.

Here, the two descriptions of Wright's penis, curvature and slight blend, are not mutually exclusive. In the medical context, "curvature" means "an abnormal curving," so Wright's penis may indeed have been bent, but not abnormally so, explaining the difference between C.T. and the doctor's descriptions. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 558 (2002). There are also some unaccounted-for variables that could explain the difference in descriptions: whether

Wright was erect or not[11] and from what angle C.T. saw Wright's penis.[12]  In other words, Wright's evidence does not directly contradict C.T.'s trial testimony, and defense counsel could reasonably have concluded that it was not an avenue worth exploring further.  In short, Wright's medical evidence is not exculpatory, and defense counsel's decision not to present it was not deficient.[13]

Even assuming defense counsel was deficient for failing to introduce medical evidence from Wright's doctor, Wright fails to show prejudice.  To prove prejudice, Wright must show that "'there is a reasonable probability that, but for'" counsel's failure to introduce the medical evidence, "'the outcome of the proceedings would have been different.'"  *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862).  But in the face of the overwhelming evidence against Wright—primarily the testimony of the boys—Wright fails to carry his burden.

---

[11]  In his forensic interview, C.T. said Wright's penis was initially "flaccid," but that "as [Wright] started to walk off, he [was erect]."  PRP, App. C, Ex. C at 170, 173.

[12]  In his statement of facts, Wright notes that defense counsel did not "consult or retain a urologist or other medical expert to examine Wright's penis and provide a more comprehensive report." PRP at 12-13.  However, Wright does not argue failure to investigate in his petition.  And, a urologist or other medical expert would not have been able to account for the variables noted above, nor for the years between C.T.'s observation of Wright's penis and trial.

[13]  In his statement of facts, Wright notes he "told his attorney that he regularly travelled out of state for work between February 2008 and April 2010," and that he "provided [defense counsel with] medical records showing that [K.W.] suffered from insomnia." PRP at 11, 13.  Presumably, Wright provided that material (also attached to his petition) as potentially exculpatory evidence. However, Wright does not mention his alleged out of state travel in his argument about exculpatory evidence, nor does he provide the travel records themselves.  Furthermore, to the extent Wright implies that defense counsel should have investigated Wright's travel schedule or K.W.'s insomnia, he does not argue failure to investigate in the argument section of his petition.  Nor does he mention his wife's insomnia records when he argues defense counsel should have called K.W. to testify.

No. 57923-5-II

While the boys varied in recounting the specific dates and times when Wright abused them, the details of what they recounted were largely consistent. For example, while C.T.'s age and grade estimates for the travel trailer incident varied between his pre-trial interviews and testimony at trial, C.T. consistently placed the incident before the Wrights moved to California for the second time. Furthermore, D.T.'s recollection of the manner in which Wright abused him was consistent throughout his pre-trial interviews and trial testimony. H.T. also described how Wright abused him consistently between his pre-trial interviews and his testimony at trial. In the face of this testimony, C.T.'s alleged inability to accurately describe Wright's penis would not have been likely to change the outcome of the proceeding. Thus, even if defense counsel should have offered the medical evidence, his failure to do so did not prejudice Wright. Wright's ineffective assistance claim fails.

Because Wright fails to show that defense counsel's performance was deficient, he fails to show defense counsel provided ineffective assistance. Accordingly, we deny Wright's petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Veljacic, J.

Price, J.

24